# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gregory Bundy,                      :
:           Appellant    :
:
:               v.             :   No. 436 C.D. 2016
:   Argued: February 7, 2017
City of Philadelphia Civil        :
Service Commission,           :


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE JULIA K. HEARTHWAY, Judge

<u>OPINION NOT REPORTED</u>

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**               **FILED: March 9, 2017**

In this appeal, Gregory Bundy (Bundy) asks whether the Court of Common Pleas of Philadelphia County (trial court) erred in affirming a decision of the Philadelphia Civil Service Commission (Commission) that dismissed Bundy's appeal from the City of Philadelphia (City) Streets Department's decision to terminate his employment. The decision to terminate Bundy's employment stemmed from his refusal to submit to a drug and alcohol test after a motor vehicle accident in which Bundy killed a pedestrian while driving a City-owned vehicle on way his home from a work site.

Bundy argues the Commission erred in: (1) ignoring the plain language of the City's Drug and Alcohol Policy (Policy); (2) upholding his termination based on the Policy, which does not contain language relating to off-duty conduct; and, (3) finding that Bundy was terminated for just cause absent

evidence to establish a nexus between Bundy's purported misconduct and his ability to execute his job duties. Upon review, we affirm.

## I. Background
### A. Basis for Dismissal

The Streets Department sets forth the following background and basis for Bundy's dismissal from employment. Bundy was an employee in the City's Streets Department. He was initially appointed as a Heavy Equipment Operator II in the Highway Division. Thereafter, he was promoted to Asphalt Paving Crew Chief. Bundy was later promoted to Streets Repairs Supervisor, a position he held until his dismissal from employment. Over the course of his employment, Bundy received written warnings for the following infractions: conduct; failure to check routes; quality of work; and, disobedience.

At approximately 8:10 p.m. on April 12, 2014, Bundy was involved in a motor vehicle accident while operating a City-owned vehicle, which resulted in the death of a pedestrian. On that date, Bundy clocked out of work at 5:00 p.m. One of Bundy's supervisors, Steven Lorenz (Lorenz), received a work-related email from Bundy at 5:40 p.m., but Lorenz could not account for Bundy's time between the email and the accident. Bundy next contacted Lorenz at 9:10 p.m., after the accident. When asked about his reasons for operating a City-owned vehicle at that time of evening, Bundy indicated he was on his way home from a work site. The City deemed Bundy's actions an unauthorized use of a City-owned vehicle, a violation of Streets Order No. 100, the Streets Department's Disciplinary Code.

2

The City further indicated that, after Philadelphia Police concluded its investigation at the accident scene, police transported Bundy to Police Department Headquarters for a drug and alcohol screening. Lorenz instructed Bundy that the screening needed to be performed. The Streets Department subsequently learned that Bundy refused the drug and alcohol screening after arriving at Police Department Headquarters.

The City's Risk Management Department determined Bundy's refusal to submit to drug and alcohol testing was an admission that Bundy was under the influence of a controlled substance, and, therefore, was in violation of the Policy.

The City noted that under Streets Order No. 100, this was a dismissible offense. The City also determined that Bundy's insubordination in disregarding his supervisor's instruction to undergo the screening constituted a separate violation of Streets Order No. 100.

For these reasons, the City held a hearing in July 2014. Lorenz, Kenneth Wilson (Wilson), Human Resources Manager, Ryan Sibert, Human Resources Professional and Stanley Shelton (Shelton), a union representative, attended the hearing. Lorenz determined that Bundy should be placed on suspension without pay as of July 16, 2014, pending dismissal. Bundy then attended an appeal hearing with Streets Department Commissioner David Perri, Wilson and Shelton. Ultimately, the Streets Department Commissioner determined dismissal was appropriate. As a result, Bundy remained on suspension without pay from July 16, 2014 until his dismissal. Bundy filed an appeal to the Commission.

3

## B. Commission Proceedings
## 1. Commission Hearing

The Commission held a hearing. At the hearing, Lorenz, who serves as a Chief Highway Engineer, testified on behalf of the Streets Department. Lorenz explained that on Saturday, April 12, 2014, Bundy called to inform him he was involved in an accident, police were present and he needed a supervisor to come to the scene. When Lorenz arrived at the accident scene a short time later, Bundy appeared distraught. Lorenz spoke to the police officer at the scene and learned the accident resulted in a fatality. Police asked Lorenz to stay with Bundy. At that time, Lorenz asked Bundy to take a blood test for drug and alcohol screening. The Policy allows for a drug and alcohol test after any accident involving a City-owned vehicle. The police officer stated he was willing to transport Bundy to police headquarters for testing. At that time, Bundy agreed to the blood test. Lorenz testified that if the police officer did not agree to arrange for Bundy to undergo blood testing at police headquarters, Lorenz would have directed Bundy to a hospital for testing. Bundy then left the accident scene with a police officer, although he was not under arrest. Lorenz offered to accompany Bundy, but Bundy declined. When Bundy left the scene, Lorenz was under the impression that Bundy was going to submit to a drug and alcohol test.

Lorenz did not speak with Bundy the next day, which was a Sunday. On Monday morning, Lorenz learned from the Streets Commissioner that Bundy refused the drug and alcohol test. Bundy subsequently took some time off of work. Although Bundy's refusal to submit to testing was considered an admission of guilt, the Streets Department did not initiate disciplinary action until Bundy was cleared to return to work. Bundy returned to work in June or July, at which time a

4

disciplinary hearing was conducted. At that time, Bundy was charged with insubordination, unauthorized use of a City-owned vehicle and driving under the influence (DUI). Bundy did not offer a defense at that time, and he was recommended for dismissal.

Police Officer Michael Godlewski also testified on behalf of the Streets Department. Officer Godlewski's supervisor directed him to perform a DUI test on Bundy after the accident. Officer Godlewski went to the Police Detention Unit (PDU) where Bundy was in the bay area in the backseat of a police car. Officer Godlewski asked Bundy if he would take a blood or breath test, to which Bundy responded, "no." Commission Op., 6/11/15, at 3. Officer Godlewski informed the police officer who transported Bundy that Bundy refused to submit to testing.

In addition, Police Officer James Tonkinson testified on behalf of the Streets Department. Officer Tonkinson works in the Accident Investigation Unit, and he was at the scene of the accident. Officer Tonkinson spoke to Bundy, conducted a formal interview and took notes. He asked Bundy to voluntarily submit to a blood test. Because Bundy did not appear intoxicated, Officer Tonkinson lacked probable cause to require Bundy to submit to a blood test. However, the Accident Investigation Unit's policy is to request a blood test from all parties involved in fatal accidents. Officer Tonkinson arranged for Bundy's transport to police headquarters.

5

Police Officer Charlene Joyner also testified on behalf of the Streets Department. Officer Joyner is assigned to the Traffic Unit, and she was at the accident scene for about 40 minutes before her supervisor ordered her and the Accident Investigation Officer to transport Bundy to the PDU for further processing. Officer Joyner drove Bundy to the PDU for chemical testing. Bundy rode in the backseat of her car, and Officer Joyner noticed Bundy was on the phone during the ride, but she could not hear the conversation. Bundy told Officer Joyner that he no longer wished to take the drug and alcohol test, and Officer Joyner called the Accident Investigation Officer to inform him.

Bundy presented the cross-examination testimony of Wilson, the Streets Department's Human Resources Manager, who attended Bundy's unemployment compensation hearing. Wilson testified he was unaware whether Bundy signed a consent form to undergo a drug and alcohol test on the night of the accident. The consent form is attached to the Policy as an appendix. On direct examination, Wilson testified he was not present at the accident scene, and he was not aware of any documents Bundy signed on the night of the accident.

The parties stipulated to the testimony of Lakisha Hayes (Hayes), a Streets Department employee, as follows: Bundy offered Hayes a ride home on the night of the accident and she accepted; Bundy was sober, and Hayes would not have accepted a ride from him if he was not; Bundy dropped Hayes off at home approximately 20 minutes after leaving the work site, and Bundy left almost immediately to go home; and, Hayes did not see Bundy again that night. Upon additional questioning from the Commissioners, Hayes testified she worked

6

overtime on the day of the accident. Bundy drove her home around 7:10 or 7:15 p.m.

Bundy also testified on his own behalf. On the day of the accident, he worked all day, clocked out at 5:00 p.m. and released some employees for the day. Because of budget concerns, Bundy was not authorized to work after 5:00 p.m., so he did not remain clocked in, but he continued to work because he needed to set up work schedules for the following week. Bundy testified he had "take-home privileges" with a City vehicle, which meant he drove a City-owned vehicle to and from work. Commission Op. at 4.

After Bundy finished working on the day of the accident, he drove Hayes home. He considered returning to work, but decided against it and began traveling west on Interstate 76 towards his home. At approximately 8:10 p.m., he was traveling in the right lane when something appeared and startled him. He thought his mirror hit something so he pulled over to investigate. He observed a woman crying and saw another individual on the ground. Bundy walked back to his vehicle and called 911. He also called his direct supervisor, who did not respond, so he called Lorenz. Eventually, police arrived and Bundy remained at the scene for three to four hours. Lorenz arrived at the scene around 9:00 or 9:30 p.m. Bundy later learned that the individual on the ground died. Bundy denied that Lorenz asked him to take a drug and alcohol test, but he admitted that Officer Tonkinson asked him to take a blood test. Bundy testified that if Lorenz would have asked him to take a drug and alcohol test, he would have complied. When he was transported to the PDU, he did not believe he was taking the test for City

7

purposes. Bundy denied telling Officer Godlewski or Officer Joyner that he refused the test.

Bundy also testified to his understanding of the Streets Department's "reasonable suspicion" drug testing policy, which he was required to administer because he held a supervisory position. He indicated that he never heard of police administering drug and alcohol testing in lieu of the City. Bundy testified he did not believe he was on-duty at the time of the accident because he already clocked out and was headed home. He only knew he needed to call his supervisor. Bundy denied that he was drunk or that he consumed alcohol on the day of the accident.

Bundy explained that he did not return to work the Monday after the accident because he had a hard time coping with the fact that someone died as a result of the accident. He was diagnosed with post-traumatic stress disorder, and he was on leave until he was cleared to return to work in July 2014.

**2. Commission Decision**

Ultimately, the Commission determined the Streets Department met its burden of proving just cause existed for Bundy's dismissal from employment. The Commission noted that, once it was proven that a public employer sanctioned an employee for just cause, it could not modify or reverse the sanction imposed by the public employer.

Initially, the Commission determined the Policy applied here where a City employee with "take home" privileges was involved in an accident while returning home from work. Bundy argued the Policy did not apply because the

accident did not occur while he was on duty, and, to be operative, the Policy required that the accident occur while he was on-duty. On the other hand, the Streets Department asserted that the Policy did apply. The Commission agreed with the Streets Department.

In so doing, the Commission stated that a strict reading of the Policy language focused on by Bundy did not take into account the spirit and intent of the Policy, which was to create a safe working environment for "City employees and all citizens." Commission Op. at 6. In order to protect its citizens, the Commission explained, the City must hold employees accountable when they are operating City-owned vehicles. Thus, the Commission determined it was reasonable to assume the City intended to cover both employees driving during work hours, breaks and lunch, as well as commuting times for employees with "take home" privileges. Id.

Further, the Commission stated, despite Bundy's argument, he still followed the Policy's protocol on post-accident procedures by alerting his supervisor immediately after the accident. The Commission indicated this act showed Bundy knew he had an obligation to follow City policies while driving a City-owned vehicle even though he was not "on the clock" at the time of the accident. Id.

In finding the Policy applied, the Commission stated, it was constrained to deny Bundy's appeal for multiple reasons. First, the Commission noted, other than the instant disciplinary action, Bundy was a long-standing City

9

employee with an almost unblemished record. Nevertheless, the Commission found the testimony of the Streets Department's witnesses more credible than that of Bundy. Specifically, as to Lorenz's testimony, the Commission found that he ordered Bundy to take a drug and alcohol test, and that he allowed police to conduct the test as part of its investigation. Although Bundy testified Lorenz never ordered him to take a drug and alcohol test, the Commission expressly rejected Bundy's testimony. As a supervisor, the Commission stated, Bundy should have been well aware of the Policy, which allowed for drug and alcohol testing after an accident in a City-owned vehicle. In light of the tragic nature of the accident, the Commission stated, it did not believe Lorenz would fail to order a drug and alcohol test as allowed by the Policy.

The Commission found Officer Tonkinson's testimony particularly persuasive. To that end, Bundy testified he did not refuse the drug test at the PDU, but that Officer Joyner advised him he no longer needed to take the test. However, Officer Tonkinson credibly testified he asked Bundy to volunteer for a test because he did not have probable cause to require Bundy to submit to testing. Further, and most importantly, Officer Tonkinson testified he asked Bundy to volunteer for a test because it is his unit's policy to seek drug and alcohol tests for all parties involved in fatal accidents. Absent any evidence to the contrary, the Commission stated, it had no reason to believe the Accident Investigation Unit would suddenly abandon its accident investigation procedures and decide not to test Bundy.

For these reasons, the Commission concluded Bundy did, in fact, refuse drug or alcohol testing once he arrived at the PDU. It determined Bundy's

10

refusal to submit to drug and alcohol testing constituted misconduct and supported a finding of just cause for his dismissal. Bundy appealed to the trial court.

### C. Trial Court Decision

Without taking additional evidence, the trial court dismissed Bundy's appeal. Bundy appealed to this Court, and the trial court directed him to file a concise statement of the errors complained of on appeal, which he did. The trial court then issued an opinion in support of its order pursuant to Pa. R.A.P. 1925(a).

In its opinion, the trial court discerned no error in the Commission's interpretation or application of the Policy. The trial court stated:

> [Bundy] argues that the Commission erred in [its determination], as it examined the 'spirit and intent' of the Policy rather than its plain language. Notwithstanding the language of the Policy, this court cannot disagree with the Commission's reasoning. If [Bundy] were [sic] to be reinstated, that reinstatement would, indeed, render the Policy useless. All any employee, driving a City-owned vehicle involved in an accident and after refus[ing] a test, would need to do in order to avoid disciplinary charges would be to drive the vehicle and claim they were [sic] not on the clock. As [Bundy] himself testified, even if an employee was not on the clock, that does not necessarily mean they are [sic] not conducting City business or still working. The Policy provides numerous other safeguards, such as prohibiting the use of alcohol during lunch and break periods. The Policy states that employees operating motor vehicles must not take medication impairing their ability to function. The purpose of the Policy is to establish that all of the premises and motor vehicles used by the City shall be maintained as a safe, alcohol free environment, for the protection of both citizens and employees. … The Policy provides that refusal to cooperate in a drug or alcohol test will result in a positive test result. Streets Order 100

11

provides that being under the influence of an intoxicating substance carries a penalty of suspension with intent to dismiss. The section of the Policy covering Post Accident Procedures does not require reasonable suspicion or that the test be given at the [medical evaluation unit]. It states only that an employee involved in an accident must be readily available for testing, if so ordered by his supervisor, who he is also required to contact. Consequently, this court cannot find an error of law in the Commission's determination that the Policy applied to [Bundy] where he was driving a City-owned vehicle and was involved in a fatal accident despite the fact that he had officially clocked out of work at 5:00 p.m. and continued to work until 7:00 p.m.

Additionally, the Commission's findings were supported by substantial evidence …. In the instant case the Commission made credibility determinations, namely that [Bundy's] testimony that Officer Tonkinson [did not] [instruct] him to take the drug test, and that the police informed him he was free to go, were not credible. The Commission found the testimony of [Bundy's] supervisor [Lorenz], credible, namely that Lorenz ordered [Bundy] to take a drug test. The Commission additionally found the testimony of Officers Joyner, Tonkinson, and Godlewski credible, namely, that [Bundy] initially agreed to go to police headquarters to take the test but that he later withdrew his consent as soon as he arrived at police headquarters. Further, the record also does not support [Bundy's] version of events. Police records included as exhibits show that [Bundy] did not stop immediately, as he testified, but that another motorist followed him to stop him and blocked his vehicle from leaving. Police Corporal John Niles of the Pennsylvania State [Police] noted that he advised another trooper to keep an eye on [Bundy] as he may have been trying to leave the scene. Lorenz himself stated, in his recommendation for disciplinary action, that [Bundy] was being uncooperative at the scene and that he instructed [Bundy] to have a test done, and that there was some 'back and forth' with [Bundy] regarding the test before he was later informed [Bundy] had refused the test. Officer Joyner stated that [Bundy] had been on the phone while she

transported him to Police Headquarters and that he told her that he did not trust the police.

> In the instant case the record did support that [Bundy] was ordered to take the test by Lorenz, and that he refused. This is the reason the [Streets] Department dismissed him, and the reason the Commission upheld his dismissal. As such, the dismissal was proper and should be affirmed.

Tr. Ct., Slip Op., 6/17/16, at 15-17 (citations omitted). This matter is now before us for disposition.

## II. Issues

On appeal,[1] Bundy asserts the Commission erred in: (1) ignoring the plain language of the Policy and instead utilizing a "spirit and intent" it created to nullify the Policy's express terms, thereby creating a new policy, which it then applied to Bundy; (2) upholding Bundy's termination based on the Policy, which the City conceded did not contain language governing off-duty conduct; and, (3) finding that Bundy, an 18-year veteran of the Streets Department, was terminated for just cause absent any evidence establishing a nexus between Bundy's non-participation in a voluntary blood test conducted by Philadelphia Police at police headquarters and his ability to execute his job duties.

---

[1] A court's review of a municipal civil service commission is limited. Where a full and complete record is made of the proceedings before a municipal civil service commission, a reviewing court must affirm the adjudication unless it is in violation of the constitutional rights of the appellant or not in accordance with law, the procedural provisions of the local agency law are violated or a finding of fact of the commission necessary to support its adjudication is not supported by substantial evidence. Davis v. Civil Serv. Comm'n of Phila., 820 A.2d 874 (Pa. Cmwlth. 2003).

13

## III. Discussion
## A. Interpretation and Application of the Policy
## 1. Contentions

Bundy first argues the Commission erred in ignoring the Policy's unambiguous language and refusing to apply the plain meaning of its terms. Instead, he contends, the Commission created a "spirit and intent" standard to nullify the Policy's valid terms so that it could apply or interpret the Policy how it wished.

Bundy asserts the Policy, a contract negotiated and bargained for by and between the City and various unions and which bound both the City and every one of its non-uniformed employees, must be interpreted in accordance with general principles of contract interpretation. Bundy then sets forth general principles of contract interpretation, and he argues, where, as here, a contract is unambiguous, a reviewing tribunal should not look beyond the contract's language in interpreting the meaning of its terms.

Here, Bundy argues he was terminated on the ground that he violated Section C of the Policy. As Lorenz testified, the Policy was a "union-management" document negotiated and bargained for by and between the City and its unions. Appellant's Br. at 16 (citing Commission Hr'g, Notes of Testimony, 3/11/15, at 29). Because it was the result of negotiations and bargaining, Bundy asserts, the Policy is a contract. Bundy maintains that, as the reviewing body determining the applicability of the contract used to terminate him, the Commission was required to follow established legal principles.

14

Bundy asserts that while the City consistently misquoted the applicable sections of the Policy, excluding from its recitation essential and precise language that is harmful to its position, it has not at any point alleged the Policy is ambiguous. Nor did any witness testify to any ambiguity. Further, Bundy contends the City essentially conceded the Policy is unambiguous below. See Tr. Ct. Hr'g, Notes of Testimony, 2/18/16, at 26-27. Bundy also maintains that neither the Commission nor the trial court made any finding of ambiguity. As such, Bundy asserts, the inquiry must be limited to the four corners of the Policy.

Bundy points out that Section C of the Policy states:

**C. POST ACCIDENT DRUG AND ALCOHOL SCREENING**

1. A non-uniformed employee who is involved in an accident <u>as defined in Section III. A.1.</u> while operating a [City] motor vehicle or a personally owned vehicle <u>operated while conducting [City] business</u> shall inform his or her supervisor of the accident as soon as practicable and shall remain readily available for drug and alcohol testing, if required by the appointing authority or designee. Failure to notify a supervisor of an accident may result in discipline.

Supplemental Reproduced Record (S.R.R.) at 309b (emphasis added). In turn, Section III.A.1. of the Policy provides:

**III. DEFINITIONS:**
A. For the purposes of this policy, the following definitions shall apply:

1. The term '<u>accident</u>' shall mean any occurrence involving the operation of a motor vehicle, which results in the loss of human life or bodily injury requiring

15

[hospitalization] for medical treatment or observation, or resulting property damage of more than $500.00. The term shall also mean any occurrence involving the operation of a motor vehicle that results in an employee's citation for [DUI]. Any such incident or accident <u>must occur while on duty</u>.

2. 'Operation of a Motor Vehicle' shall mean the operation of a City owned or leased vehicle or the operation of a personal vehicle being used while performing job duties.

S.R.R. at 304b-05b (emphasis added). Bundy notes that the Policy does not define the term "on duty"; thus, that term must interpreted according to its plain meaning. According to Merriam-Webster's Online Dictionary, Bundy asserts, "on duty" is defined as "working at a particular time."[2] According to the same source, "working" is defined as "engaged in work especially for wages or a salary."[3] "Job" is defined as "the work that a person does in order to earn money."[4] And, "duty" is defined as "something that is done as part of a job."[5] As such, Bundy argues, the plain meaning of Section C of the Policy is that any non-uniformed employee driving a City-owned vehicle who is involved in a fatal accident *while engaged in work* shall inform his supervisor and shall remain available for drug testing, if required.

---

[2] Merriam-Webster's Online Dictionary, Definition of duty (5), https://www.merriam-webster.com/dictionary/on%20duty (last visited Feb. 14, 2017).

[3] Merriam-Webster's Online Dictionary, Definition of working (2), https://www.merriam-webster.com/dictionary/working (last visited Feb. 14, 2017).

[4] Merriam-Webster's Online Dictionary, JOB Defined for English Language Learners, https://www.merriam-webster.com/dictionary/job (last visited Feb. 14, 2017).

[5] Merriam-Webster's Online Dictionary, Duty Defined for English Language Learners, https://www.merriam-webster.com/dictionary/duty (last visited Feb. 14, 2017).

Here, Bundy asserts, it is undisputed that he clocked out of work at 5:00 p.m. on the night of the accident. Commission Op. at 1. It is also undisputed that he had "take home" privileges that allowed him to possess and use a City-owned vehicle both during and after work hours. Id. at 4. Additionally, it is undisputed that the accident occurred at approximately 8:10 p.m. Id. Further, it is undisputed that at 8:10 p.m., Bundy was not being paid by the City, and he was not performing any work duties, but rather was on his way home. Id. Thus, Bundy contends, he was not on duty when the accident occurred. Because Section C of the Policy is, by its express terms, only triggered if an accident occurs when an employee is on duty, Bundy maintains, it was not triggered when he was involved in an off-duty accident.

Notwithstanding this plain language, Bundy argues, the Commission found that a strict reading of the Policy did not take into account its spirit and intent. Thus, the Commission determined, it was reasonable to assume the City intended to cover both employees during work hours, breaks and lunch, as well as covering commuting times for employees with "take home" privileges. In so finding, Bundy asserts, the Commission violated basic tenets of contract law. To that end, he maintains, the Commission ignored the clear, unambiguous text of the Policy.

Bundy also asserts, assuming for the sake of argument that this Court finds the Policy is not a contract, but rather is more akin to a statute, the Commission's interpretation and application still constitutes reversible error. Specifically, he contends, even if the policy is interpreted like a statute, the

17

Commission was still faced with unambiguous language; as such, it was required to accept the express terms as a manifestation of the parties' intent. As a result, Bundy asserts, under a statutory construction analysis, the Commission's creation of a "spirit and intent" concept to nullify the terms of an unambiguous document constitutes error.

In addition, Bundy argues, even if the relevant Policy provisions were ambiguous, the Commission's effort to create a "spirit and intent" exception to reach its decision still constitutes reversible error as the term "on duty" is not reasonably subject to more than one meaning.

Moreover, Bundy contends, even where a document is ambiguous, ambiguities can only be resolved through the presentation of competent evidence. Here, he argues, the only Streets Department employee who testified at the hearing was Lorenz, and he made no mention of any ambiguity. Bundy also asserts Lorenz did not testify to any alternative meaning of any Policy term.

## 2. Analysis

The issue before the Commission on an appeal of a dismissal is to determine whether the City proved the charges against the employee and whether those charges constitute just cause for discipline. Philadelphia Home Rule Charter §7-303, 351 Pa. Code §7.7-303 (dismissal of civil service employee "shall be for just cause only"); City of Phila. v. Civil Serv. Comm'n (Johnson), 967 A.2d 1034 (Pa. Cmwlth. 2009).

18

Just cause is "largely a matter of discretion on the part of the head of the department." Davis v. Civil Serv. Comm'n of Phila., 820 A.2d 874, 878 (Pa. Cmwlth. 2003). Just cause for dismissal must be related to the inefficiency, delinquency or misconduct of the employee. Id. However, even a single instance of misconduct or an error of judgment can constitute just cause for dismissal if it adversely reflects on an employee's fitness for his duties. Id.

> Further,
>
> [t]o be sufficient … the cause should be personal to the employee and such as to render him unfit for the position he occupies, thus making his dismissal justifiable and for the good of the service.
>
> … All the law requires is that the cause be not religious or political, but concerned solely with the inefficiency, delinquency or misconduct of the employe[e]. A wide latitude must be left to the superior officer-in-fact a discretion conditioned on its exercise in good faith and not as a screen for some reason not based upon the fitness of the employe[e] to fill the position.

Benvignati v. Civil Serv. Comm'n, 527 A.2d 1074, 1075 (Pa. Cmwlth. 1987).

In addition, as an appellate court, we cannot reweigh the evidence or substitute our judgment regarding which witnesses to believe. Perry v. State Civil Serv. Comm'n, 38 A.3d 942 (Pa. Cmwlth. 2011). Whether conduct constitutes just cause for dismissal is an issue of law subject to this Court's plenary review. Johnson.

19

Here, the Streets Commissioner dismissed Bundy from his employment as a Streets Repair Supervisor based on his refusal to submit to a drug and alcohol test after a motor vehicle accident in which Bundy hit and killed a pedestrian while operating a City-owned vehicle. S.R.R. at 329b. The Commissioner also determined that Bundy's disregard of his supervisor's instruction to submit to the drug and alcohol test constituted insubordination. Id. Further, the Commissioner noted, because Bundy's supervisor could not account for the period between Bundy's last email (at 5:40p.m.) and the accident (after 8:00 p.m.), Bundy engaged in the unauthorized use of his City-owned vehicle.

Ultimately, the Commission determined the Streets Department proved just cause for Bundy's dismissal from employment. In so doing, the Commission explained, as relevant:

> [W]e find that the [Policy] is applicable in this case where a City employee with 'take home privileges' is involved in an accident while returning home from work. [Bundy] argues that the [Policy] does not apply [here] because the accident did not occur while he was on duty. The [Streets] Department, on the other hand, argues that the Policy does apply because a strict interpretation of the Policy would render it useless. We agree with the [Streets] Department. A strict reading of the Policy language fails to take into account the spirit and intent of the Policy which is to create a safe working environment for 'City employees and all citizens.' In order to protect its citizens, the City must hold employees accountable whenever they are driving City-owned vehicles. Accordingly, it is reasonable to assume that the City intended to cover both employees driving during working hours, breaks and lunch, as well as covering commuting times for employees with 'take home privileges.' …

20

Interestingly enough, we note that despite [Bundy's] argument, he nevertheless followed the Policy rules on post-accident procedure by alerting his supervisor immediately after the accident. This act demonstrates that [Bundy] knew he had an obligation to follow City policies while driving a City-owned vehicle even though he was not working at the time of the accident.

In finding that the [Policy] applies in this case, after a review of the evidence presented, we must deny the instant appeal for the following reasons. …

[T]he Commission finds that the testimony of [the Streets] Department's witnesses is more credible than the testimony rendered by [Bundy]. Specifically, in regard to the testimony of [Lorenz], we find that he ordered [Bundy] to take a drug /alcohol test and allowed [Bundy] to have the [p]olice perform the testing since it was part of their [sic] investigation. Although, [Bundy] testified that [Lorenz] never ordered him to take a drug/alcohol screen, we find that assertion unbelievable. As a supervisor, [Bundy] should be well aware of the [Streets] Department's policy allowing for drug and alcohol testing following an accident in a City-owned vehicle. In light of the tragic nature of the accident, we do not believe [Lorenz] would fail to order a drug and alcohol test as allowed for by the Policy.

Additionally, this Commission finds Officer Tonkinson's testimony particularly persuasive. [Bundy] testified that he did not refuse the drug test at the PDU, but that Officer Joyner advised him that he no longer needed to take the test. However, Officer Tonkinson credibly testified that he asked [Bundy] to volunteer for a test because he did not have probable cause to require [Bundy] to submit to testing. Furthermore, and most importantly, Officer Tonkinson testified that he asked [Bundy] to volunteer for a test because it is his unit's policy to seek drug and alcohol testing for all parties involved in fatal accidents. Absent any evidence to the contrary, we have no reason to believe that the Accident Investigation Unit would suddenly abandon its accident

21

investigation procedures and decide not to test [Bundy]. Accordingly, this Commission believes that [Bundy] in fact refused testing once he arrived at the PDU.

Based on the foregoing, we find that [Bundy's] refusal to submit to drug testing constitutes misconduct and supports a finding of just cause for his dismissal.

Comm'n Op. at 6-7 (citation omitted).

For the reasons set forth below, we agree with the result reached by the Commission, *i.e.*, that the Streets Department proved just cause for Bundy's dismissal from employment. However, we do not base our determination on the "spirit and intent" of the Policy. Rather, our review of the relevant Policy provisions as a whole leads to a conclusion that the Policy applies here and that Bundy violated the Policy. Moreover, the Commission's supported determinations reveal that Bundy was insubordinate in refusing to follow Lorenz's direction that he undergo a drug and alcohol test at police headquarters.

With regard to the applicability of the Policy to the facts presented here, Section II of the Policy states, as pertinent:

The … use of prohibited substances or alcoholic beverages is strictly prohibited while on City premises; or during any work hours; or while driving City-owned or -leased motor vehicles; or while driving personal motor vehicles, owned or leased, while conducting City business. This includes during lunch and break periods.

S.R.R. at 303b (emphasis added). Additionally, the testing "Consent Form", which is attached as Appendix II of the Policy states: "**Refusal to cooperate in a drug or alcohol test will result in a positive test result**." S.R.R. at 315b (emphasis in

22

original); see also S.R.R. at 39b (Lorenz testified: "It is the Streets Department position that because the blood test was not done, it's an admission of guilt ….").

Further, Section V(C)(1) of the Policy ("POST-ACCIDENT DRUG AND ALCOHOL SCREENING") provides:

> A non-uniformed employee who is <u>involved in an accident as defined in Section III.A.1. while operating a [City] motor vehicle</u> or a personally owned vehicle operated while conducting [City] business shall inform his or her supervisor of the accident as soon as practicable and <u>shall remain readily available for drug and alcohol testing, if required by the appointing authority or designee</u>. …

S.R.R. at 309b (emphasis added).

In turn, Section III(A)(1) defines "accident" as:

> any occurrence involving the operation of a motor vehicle, which results in the loss of human life or bodily injury requiring hospitalization for medical treatment or observation, or resulting in property damage of more than $500.00. The term shall also mean any occurrence involving the operation of a motor vehicle that results in an employee's citation for [DUI]. Any such incident or accident must occur while on duty.

S.R.R. at 304b. Also, the Policy defines "Operation of a Motor Vehicle" as "<u>the operation of a City owned or leased vehicle</u> or the operation of a personal vehicle being used while performing job duties." S.R.R. at 305b (emphasis added).

23

Here, Bundy served as a Street Repair Supervisor in the Highway Division of the Streets Department. S.R.R. at 249b. The Highway Division maintains City streets and performs snow removal. S.R.R. at 250b.

As a Streets Repair Supervisor, Bundy had supervisory authority over 22 employees, and he was charged with ensuring that those employees followed the Policy. S.R.R. at 244b, 251b, 265b. Bundy was also required to account for and be responsible for the use of City property. S.R.R. at 255b-56b. Further, as a supervisory-level employee, Bundy had "take home" privileges of his City-owned vehicle. S.R.R. at 60b; 257b.

In April 2014, while operating his City-owned vehicle on his way home after leaving the job site, Bundy struck and killed a pedestrian who was on the shoulder of Interstate 76. S.R.R. 259b-263b. In his testimony before the Commission, Bundy acknowledged that he was required to inform his supervisor of the accident. R.R. at 266b. Further, the credited testimony reveals that after the accident, Bundy's supervisor, Lorenz, directed Bundy to submit to drug and alcohol screening, and that Bundy refused. S.R.R. at 26b, 89b, 128b-29b, 156b. Further, although Bundy argues he was not "on duty" when the accident occurred because he already "clocked out," Bundy construes the Policy too narrowly.

To that end, as set forth above, Section II of the Policy prohibits employees from using prohibited substances or alcoholic beverages while driving City-owned motor vehicles. Noticeably absent from this provision is any language that requires that the employee be "on the clock;" to the contrary, the provision

24

explicitly contemplates that it applies during other "off the clock" periods, *i.e.*, lunch and break periods.  S.R.R. at 303b.

In addition, Section V(C)(1) of the Policy states that an employee involved in an accident (as defined in Section III(A)(1)) while operating a City vehicle shall, among other things, remain available for drug and alcohol testing, if required.  Section III(A)(1) defines an accident, in pertinent part as, any occurrence involving the operation of a vehicle that results in the loss of human life.  It also states: "Any such … accident must occur while on duty."  S.R.R. at 304b. The term "on duty" is not defined in the Policy.

Nevertheless, the dictionary broadly defines the term "on duty" as "engaged in or responsible for an assigned duty or task."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 360 (10th ed. 2001); see also WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 705 (2002) (defining "on duty" as "assigned to a task or duty; engaged in or responsible for some specific performance").  Here, as an employee with "take home" privileges, Bundy was responsible for the assigned duty of safely operating his City-owned motor vehicle to and from his work site. Indeed, before the Commission, Lorenz credibly explained: "[Bundy] has take-home privileges. Therefore the responsibility of that vehicle to get to and from the job site is his."  S.R.R. at 60b.  As such, no error is apparent in the Commission's ultimate determination that the Policy applied to the facts presented here.

This conclusion is supported by our review of the Policy as a whole. More particularly, our review of the Policy in its entirety reveals that, with regard

to the operation of a motor vehicle, the phrase "while conducting [City] business" is *only* used in connection with references to an employee's use of his *personally-owned vehicle*. Thus, an employee who is operating a *City-owned* vehicle is considered to be conducting City business and subject to the Policy's drug and alcohol screening requirements in the event of an accident. Indeed, Section II of the Policy "strictly prohibits" the use of alcoholic beverages or prohibited substances while driving City-owned vehicles *regardless of whether* an employee is conducting City business while operating the City-owned vehicle. S.R.R. at 303b.

Consequently, no error is apparent in the Commission's determination that the Policy, which required Bundy to submit to a drug or alcohol test after an accident that resulted in a fatality when directed to do so by his supervisor, applied here and was violated. In turn, no error is apparent in the Commission's determination that Bundy's violation of the Policy constituted just cause for his dismissal from employment. See, e.g., Davis (single instance of misconduct or error of judgment can constitute just cause for dismissal if it adversely reflects on a person's fitness for his duties); see also Perry (affirming removal of manager for violating policy prohibiting possession of weapons in workplace). Additionally, because the credited evidence reveals Bundy refused to follow his supervisor's directive that he submit to drug and alcohol testing after the accident, Bundy's conduct constituted insubordination,[6] which also establishes just cause for his dismissal. See, e.g., Gonzales v. Dep't of Public Welfare, 408 A.2d 893 (Pa.

---

[6] Insubordination denotes either disobedience or defiance or contempt of authority and is simply an unwillingness to submit oneself to the authority of organizational superiors. McCain v. Dep't of Educ., E. Stroudsburg State Coll., 454 A.2d 667 (Pa. Cmwlth. 1983).

Cmwlth. 1979) (failure to follow a supervisor's instructions is an example of behavior that goes to the merits and is just cause for dismissal; thus, just cause existed to remove employee who refused to leave employer's premises after being instructed to do so).

## B. Standards for Off-Duty Conduct
## 1. Contentions

Bundy next asserts the Commission erred when it found that just cause existed to terminate him despite the City's failure to present evidence establishing a standard of conduct by which to measure the off-duty conduct of Streets Department employees.

Bundy contends the central question underlying this case is whether or not he was subject to the Policy when he was involved in the accident such that his failure to participate in a voluntary blood test was a basis for termination. Because Bundy was not employed in a safety sensitive position, he argues, his off-duty conduct could only result in termination if there was a written work rule creating a standard of conduct applicable to his off-duty conduct or if the conduct related directly to a function of his job, thus rendering him no longer qualified. As there is no evidence of either, he asserts, the Commission's finding of just cause is erroneous.

To that end, Bundy maintains, determining whether an agency carried its burden of proof and production regarding just cause for termination is a two-part inquiry. First, the agency must present evidence establishing the factual truth of its allegations. Second, the agency must show the proven allegations touched on

27

the employee's fitness for employment such that dismissal is warranted. Soergel v. Bd. of Supervisors of Middlesex Twp., 316 A.2d 89 (Pa. Cmwlth. 1974).

Bundy acknowledges that employees in "highly sensitive" positions are generally subject to stricter, more stringent standards of conduct because of the need to avoid an appearance of impropriety. Johnson, 967 A.2d at 1039 (internal citation omitted). As such, they can routinely be removed as a result of both on- and off-duty conduct, even where there is no rule that explicitly proscribes the conduct in which they engaged. See e.g. Stone v. State Corr. Inst. at Graterford, 422 A.2d 1227 (Pa. Cmwlth. 1980). Similarly, Bundy asserts, individuals who function in law enforcement or investigative capacities can also be subject to removal after off-duty misconduct if the conduct shows a lack of judgment that erodes confidence in the character required to perform their duties. See, e.g., Johnson.

Bundy maintains that civil service employees that do not serve in highly sensitive positions or positions involving investigatory functions can generally be subject to discipline for off-duty misconduct if the agency shows the off-duty conduct directly relates to the employee's ability to execute his job duties, even in the absence of a written work rule. See, e.g., Walsh v. State Civil Serv. Comm'n (Dep't of Transp.), 959 A.2d 485 (Pa. Cmwlth. 2008) (just cause existed to terminate supervisor who inappropriately accessed confidential information of his ex-wife's paramour when he was a high-ranking employee responsible for both safekeeping records and ensuring other employees did not violate agency policy). Bundy contends that, although there was a written work rule in Walsh, this Court

28

focused on the relatedness of the conduct to the employee's job duties. Id.; accord City of Phila. v. Civil Serv. Comm'n (Gibbs), (Pa. Cmwlth., No. 2531 C.D. 2009, filed December 22, 2011) 2011 WL 10877954 (unreported) (finding just cause to terminate employee who admitted to submitting false timesheets at his part-time job when, as a civil servant, he was responsible for conducting investigations, collecting samples and testifying to their chain of custody and his honesty and integrity were integral to his job); see also Tech v. Wattsburg Area Sch. Dist. Bd. of Educ., 373 A.2d 1165 (Pa. Cmwlth. 1977) (finding just cause to terminate bus driver after two off-duty accidents, despite her clean "on-duty" record, when accidents were her fault and created doubt as to her ability to safely drive a school bus).

Bundy maintains that, absent evidence that the off-duty conduct directly relates to an employee's job duties such that it makes him unfit for continued employment, a civil servant in a non-safety sensitive position can only be terminated based on off-duty conduct if the alleged conduct is proscribed by written work rule. In support, Bundy relies primarily on Philadelphia Civil Service Commission v. Owens, 556 A.2d 967 (Pa. Cmwlth. 1989). Bundy asserts the facts underlying his termination are strikingly similar to those in Owens. Here, he argues, his off-duty conduct was used as the basis for his termination. As such, the City appropriately cited to a policy, which it asserts is the applicable written work rule. Bundy contends the Commission's duty was to examine the Policy and determine whether his off-duty conduct violated it. Because the plain language of the Policy expressly excludes accidents that occur while an employee is off-duty, Bundy argues, the Policy is not a written work rule proscribing his off-duty

29

conduct. As such, it cannot form the basis for his termination because the rule only applies to on-duty accidents.

Bundy contends the stated reason for his removal was "refusal to be tested is an admission of being under the influence of a controlled substance and therefore, violates the [Policy]." Br. of Appellant at 30. Integral to determining whether the City proved this charge is establishing that Bundy was required to be tested. In presenting no evidence establishing that Bundy violated any policy, he argues, here, as in Owens, there is no standard of conduct to apply to his off-duty conduct and, as such, no evidence on which the Commission's finding of just cause can stand.

## 2. Analysis

Based on our determination that the Commission properly determined the Streets Department proved just cause for Bundy's dismissal from employment based on Bundy's violation of the Policy (as well as his insubordination in refusing his supervisor's direction to submit to a drug and alcohol test), this argument fails.

In any event, Owens, the primary case relied on by Bundy, is distinguishable. There, we held that just cause did not exist to terminate the employment of a civilian tow truck operator for the Philadelphia Police Department where there was no dispute that the misconduct occurred while the employee was off-duty, and the Philadelphia Police Department did not present any evidence that its standard of conduct for the off-duty conduct of police officers extended to civilian personnel.

As set forth above, here, unlike in Owens, the Streets Department established the existence of the Policy, its applicability to Bundy, a supervisory-level City employee who was operating a City-owned vehicle, and the fact that Bundy violated the Policy (and was insubordinate) by refusing his supervisor's direction to submit to a drug and alcohol test. Thus, Owens does not compel the result Bundy seeks.

Moreover, in City of Philadelphia v. City of Philadelphia Civil Service Commission (Carter), 895 A.2d 87, 92-93 (Pa. Cmwlth. 2006), we explained:

> In deciding whether a public employer has established just cause for dismissing a civil service employee, this Court has identified a number of factors relevant to this determination. First, the nature of the job is an important consideration; an employee in a 'sensitive position' may be subject to dismissal if only to avoid the appearance of impropriety whereas an employee in a non-sensitive position may not. [Stone] (holding that a corrections officer was in a 'highly sensitive' position). A second relevant factor is whether the conduct in question demonstrates a lack of judgment that erodes confidence in an employee's character. Commonwealth, Office of Attorney General v. Colbert, 598 A.2d 344 (Pa. Cmwlth. 1991) (holding that dismissal for arrest on 40 unpaid parking tickets constituted just cause). A third factor concerns safety. An employee whose job it is to protect the safety of others is expected to behave in a manner consistent with this goal even while off duty. Doerr v. Pennsylvania Liquor Control Board, 491 A.2d 299, 303 (Pa. Cmwlth. 1985) (loss of service revolver by Liquor Control Board officer in the course of off-duty altercation constituted just cause for dismissal). …

31

Here, these factors weigh in favor of the conclusion that the Streets Department had just cause to dismiss Bundy. As explained above, Bundy was a supervisor charged with responsibility for 22 employees as well as City vehicles and property. He was also charged with ensuring employees complied with the Policy. Bundy's refusal to submit to drug and alcohol testing after his involvement in a fatal accident while operating a City-owned motor vehicle and his disregard of his supervisor's directive that he undergo such testing showed poor judgment that eroded the Streets Department's confidence in Bundy. Additionally, Bundy's violation of the Policy obviously raised concerns over his ability to safely utilize City property and properly supervise employees.

## C. Nexus
### 1. Contentions

As a final issue, Bundy argues the Commission and the trial court erred by upholding his termination where no evidence was presented of a nexus between Bundy's ability to perform his job and his failure to submit to a voluntary drug test after an off-duty accident.

Bundy asserts that in Civil Service Commission v. Poles, 573 A.2d 1169 (Pa. Cmwlth. 1990), a corrections officer was terminated because he inefficiently performed his assigned duties. In reversing the trial court and reinstating the Commission's decision, this Court found substantial evidence supported a finding of just cause. Specifically, the evidence established: the corrections officer was assigned to guard high-risk inmates; the facility had procedures to minimize the risk of inmate escape; the corrections officer did not follow these procedures; and, his failure to do so led to a fight between officers and

inmates as well as the escape of two inmates. As this Court requires, the evidence there established the misconduct as well as a correlation between the misconduct and the employee's professional competency. This Court explained that the severity of the officer's negligence cast doubt on his continued service.

Conversely, Bundy asserts, in Owens, this Court engaged in this same analysis, but found substantial evidence did *not* support a finding of just cause. Bundy further argues that in Woods v. State Civil Service Commission, 912 A.2d 803 (Pa. 2006), the Pennsylvania Supreme Court reiterated the well-established rule requiring a nexus between conduct and ability after engaging in a similar analysis.

Bundy maintains the requisite connection between the alleged misconduct and fitness for continued employment is even more attenuated here than in Owens and Woods. He argues the City bore the burden to present evidence establishing he was unfit for continued employment because his conduct affected his job performance. He contends that connection was not made. Bundy asserts that there was one witness who might have been able to make this connection, Lorenz. Although he spent a significant amount of time recounting the night of the accident, Bundy argues, Lorenz did not speak at all to Bundy's job responsibilities or how his conduct was remotely related to or affected his ability to perform his job. He also made no mention of any impact Bundy's conduct had on the Streets Department or the City. To the contrary, Lorenz testified Bundy was "a good worker . . . [and] made the best effort to do the job the best he could." N.T. at 212. Bundy contends that, as this Court consistently holds, just cause for dismissal must

33

be job-related and rationally touch on ability and competency. Here, he asserts there is no evidence that the cause of his dismissal was either job-related or rationally touched on his ability and competency.

## 2. Analysis

Again, we reject Bundy's argument. As stated above, the Streets Department established the existence of the Policy, its applicability to Bundy, a supervisory-level City employee who was operating a City-owned vehicle, and that Bundy violated the Policy (and was insubordinate) when he refused his supervisor's direction to submit to a drug and alcohol test after an accident in which he struck and killed a pedestrian. Thus, the Commission properly determined the Streets Department proved just cause for Bundy's dismissal from employment.

Further, as explained above, <u>Owens</u>, relied on by Bundy, is distinguishable. Similarly, <u>Woods</u>, also relied on by Bundy, is distinguishable. There, the Supreme Court held that the public employer, a juvenile detention center, did not prove just cause to terminate one of its counselors, based solely on the counselor's off-duty arrest for perjury and false swearing, which were unrelated to his employment, and upon which the employee was not convicted at the time of his dismissal. In so doing, the Supreme Court stated:

> While [the employee's] arrest may have warranted suspension, we disagree that his arrest alone, on perjury and false swearing charges, established just cause for removal. [The employee's] arrest alone did not rationally and logically touch upon his competency and ability to perform his job as to warrant dismissal … and therefore did not provide just cause for removal. While the

34

> [c]enter observes that [the employee] occupied a position requiring trust and integrity, his arrest alone, albeit on *crimen falsi* charges, failed to demonstrate that his trustworthiness or integrity had been compromised. The [employer] raises concerns about the damage to the reputation and credibility of the institution occasioned by [the employee's] arrest. However, just cause for removal must be related to the employee's competency and ability to perform his job, or arise from conduct rendering him unfit for the position he occupies. Injury to the reputation of the institution does not meet these criteria. On the same grounds, we decline to adopt a *per se* rule that the 'appearance of impropriety' by an employee in [a] 'highly sensitive [position]' provides just cause to warrant dismissal.

Woods, 912 A.2d at 809.

Here, unlike in Woods, we are not confronted with an employee's off-duty arrest (prior to conviction) as the asserted basis for dismissal. Rather, in this case, the Streets Department established the existence of the Policy, its applicability to Bundy, a supervisor who was operating a City-owned vehicle, and Bundy's violation of the Policy (and insubordination) based on his disregard of his supervisor's directive that he submit to a drug and alcohol test after an accident that resulted in a fatality. As explained above, Bundy's refusal to submit to testing after his involvement in a fatal accident while operating a City-owned motor vehicle and his disregard of his supervisor's directive that he undergo such testing showed poor judgment.

In addition, Bundy's violation of the Policy clearly raised concerns over his ability to safely utilize City vehicles and property and to appropriately supervise employees in light of the fact that he violated the Policy, which he was

charged with enforcing in his capacity as a supervisor. Thus, Bundy's misconduct rationally and logically touches upon his competency and ability to properly perform his job. In other words, a nexus exists between Bundy's misconduct and his ability to execute his job duties. As such, we discern no error in the Commission's determination that just cause existed for Bundy's dismissal from employment based on the facts presented here.

For all the foregoing reasons, we affirm.

ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gregory Bundy,                         :
                Appellant      :
                                   :
           v.                            :   No. 436 C.D. 2016
                                   :
City of Philadelphia Civil             :
Service Commission,                    :

## O R D E R

**AND NOW**, this 9th day of March, 2017, the order of the Court of Common Pleas of Philadelphia County is **AFFIRMED**.

 

 

                                  _____
                                  ROBERT SIMPSON, Judge